**FILED**

JEANNE A. NAUGHTON, CLERK

JUN - 6 2018

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>GGI Properties, LLC,<br><br>               Debtor. | Case No.:      16-14328-ABA<br><br><br><br>Chapter:     11 |
| GGI Properties, LLC,<br><br>               Plaintiff,<br>v.<br><br>City of Millville,<br><br>               Defendant. | Adv. No.:     16-1202-ABA<br><br>Judge:     Andrew B. Altenburg, Jr.<br><br>Hearing Date:     November 15, 16, 2017 |

## MEMORANDUM DECISION

### I.    INTRODUCTION

This court previously determined that a transfer of property to a municipality pursuant to a tax sale and foreclosure, where there was no competitive bidding, can constitute a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(B), not barred by the United States Supreme Court's holding in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994). *In re GGI Properties, LLC*, 568 B.R. 231 (Bankr. D.N.J. 2017). The court additionally concluded that the transfer could constitute an avoidable preference under 11 U.S.C. § 547(b). It thus denied the Motion for Summary Judgment filed by City of Millville ("City") on those grounds. But as it further found that there was a genuine issue of material fact regarding the value of the property transferred on December 31, 2015 (the time of the transfer via foreclosure) and March 8, 2016 (the petition date) (together, the "Relevant Dates"), it set trial on that issue. The trial having concluded and the parties having submitted memoranda of law, the court now values the property at $530,000. It finds that the debtor, GGI Properties, LLC ("GGI"), did not receive reasonably equivalent value for the transfer, therefore the transfer can be avoided as constructively fraudulent.

## II.    JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 23, 1984, as amended September 12, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F), (H). Venue is proper in this court pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 548(a)(1)(B), 547(b), and 550(a).

## III.    HISTORY OF THE PROPERTY

Glass-making has American roots in South Jersey, an area rich in the sand and iron used in glass, as well as in trees for fuel.[1] In 1779, several glassblowers from Wistarburgh Glass Manufactory, which had opened in 1739 in Alloway, New Jersey, established their own "glass works" in what became Glassboro, New Jersey.[2] Then in 1888, Dr. Theodor Corson Wheaton, a pharmacist, began making his own pill bottles in Millville, New Jersey in a company that became Wheaton USA.[3] In 2002, GGI's predecessor bought Wheaton.

Kenneth Rock, 75 years old, spent his career in the glass industry. T1, p. 116.[4] He worked for the Corning Glass Works out of college, then Sylvania to build a glass factory in Kentucky and serve as General Manager for 19 years, and finally for Wheaton Industries in Millville. *Id.*, pp. 116-17. Wheaton hired Mr. Rock in the 1990s as vice president of its glass tubing operations, and later promoted him to president and put him on its board. T1, pp. 116-17. Wheaton had its corporate headquarters, two glass factories, a research facility and a plastics division in Millville. *Id.*, p. 117. It also had operations in Elmer, Mays Landing, and Williamstown, New Jersey; a large glass factory in Flat River, Missouri; and a joint venture in China with Beijing General Glass Company. *Id.*, p. 117; *see* pp. 120-21.

At some point, Wheaton was purchased by Alusuisse, which was acquired by Alcan (and which later became part of Rio Tinto). *Id.*, p. 118. Mr. Rock was Senior Vice President of Global Glass Operations. *Id.*, p. 119. Under Alcan, the factory began to struggle. *Id.*, p. 119. Mr. Rock formed The Glass Group Inc. with Leonard Nave and some other investors to buy, *inter alia*, the subject property at 200-300 G. Street, Millville, also known as Lot 1, on September 20, 2002. *Id.*, pp. 120, 184; *In re GGI Properties, LLC*, 568 B.R. at 238. Mr. Rock became Chairman and CEO of the new company. *Id.*, p. 120. It is not known what The Glass Group paid for Wheaton. According to Mr. Rock, the company was losing money when The Glass Group bought it, and

---

[1] "How South Jersey Shaped Glass, and Vice Versa," *New York Times* (Tammy La Gorce, May 30, 2014).

[2] *Id.*, and http://www.southjersey.com/article/6949/Heritage-Glass-Museum (last visited April 26, 2018).

[3]    https://theculturetrip.com/north-america/usa/new-jersey/articles/a-brief-history-of-glassmaking-in-south-jersey/ (last visited April 26, 2018).

[4] References to the transcript of November 15, 2017 will be to "T1, p. ___," and to the transcript of November 16, 2017 as "T2, p. ___."

though he was able to bring it up to break-even condition, in 2005 it filed chapter 11 in Delaware. *Id.*, p. 121; *see* Bankr. No. 05-10532KG.[5]

While in bankruptcy, The Glass Group sold some pieces of its property to Gerresheimer Glass Inc. and Kimble Glass Inc., and other pieces to a foreign company, and on September 7, 2006, Lot 1 to GGI, again formed for this purpose, for one dollar. T1, pp. 132-33; *In re GGI Properties, LLC*, 568 B.R. at 236. GGI is owned by in equal halves by the Leonard Nave Revocable Trust, trustee Leonard Nave, and the Kenneth C. Rock Revocable Trust, trustee Mr. Rock. *Id.*, p. 162 and Ex. D-16. It is not known who the beneficiaries of these trusts are.

At the time of GGI's purchase of Lot 1 in 2006, the property was assessed at $2,650,000, with $365,100 allocated to the land and $2,285,000 to the improvements. Ex. P-20. In 2008, GGI successfully appealed that assessment, lowering the assessment to $1,676,400 as of October 1, 2007, reflecting the same $365,100 value for the land while reducing the amount allocated to the improvements to $1,311,000. *Id.*

In 2009, GGI stopped paying its real estate taxes. T1, p. 137-38. In September 2009, it listed the property for sale for $1,649,000 but it did not sell. *In re GGI Properties, LLC*, 568 B.R. at 238. Mr. Rock testified that in 2009, GGI had terminated two leases on the property at the City's request due to its concern that they were creating a hazard to the community. T1, p. 171. However, an appraisal created for GGI in 2012 (the "Kay Appraisal") referenced a month-to-month lease existing in 2012. *Id.*, pp. 120, 172. In any case, after the leases were terminated, GGI did not re-let any of the premises. *Id.*, p. 138. In August 2010, the City purchased the tax certificate for the unpaid taxes of 2009 and 2010. *In re GGI Properties, LLC*, 568 B.R. at 236.

In 2012, still not paying its taxes, GGI again appealed its assessment. T1, p. 83. The Kay Appraisal estimated the fair market value of the property from between $300,000 and $600,000. *Id.*, pp. 83-84; T2, p. 94. GGI and the City eventually settled on an assessed value of $600,000 as of October 1, 2011[6] based on this appraisal, again reflecting an assessed value of $365,100 for the land, but now only $234,900 for the improvements. *Id.*, pp. 82-83, 94; T2, p. 94. The County Tax Board entered judgment on the settlement thereafter. *Id.*, p. 113. GGI argues that the property is worth "at least $600,000" based on this assessment remaining in place as of the Relevant Dates.

Despite the reduction in the assessment, GGI did not resume paying its taxes. The City filed a complaint for an *in rem* foreclosure on October 21, 2014 and obtained a final judgment on December 31, 2015, reflecting unpaid taxes at that time of $427,767.45. Ex. P-15; *In re GGI Properties, LLC*, 568 B.R. at 236.

After that complaint had been filed but before judgment on it was entered, GGI entered into a contract for sale of the property. On January 9, 2015, Community Development, LLC ("CDL"), a company created by Richard Brooks for this purpose, signed an agreement to purchase the property for $700,000. T2, p. 34; Ex. P-4 (the "CDL Agreement"). Mr. Brooks, whose former business was demolition and liquidation, testified that he anticipated several types of businesses

---

[5] Mr. Rock blamed salaries, T1, p. 121, but others blame plastic for the decline in the 1990s of the glass industry. "How South Jersey Shaped Glass, and Vice Versa," *New York Times* (Tammy La Gorce, May 30, 2014). Ironically, one prospective purchaser of the property wants to recycle plastic at the site.

[6] The City's assessor testified that the parties agreed that the assessment for October 1, 2011 would be set at $800,000, with $600,000 thereafter, *see* T1, p. 83, but the City's records do not reflect this. *See* ex. P-20.

operating at the property, including a truck and auto auction site; an R&D lab; residential boiler manufacturing; food court backed by a microbrewery; UPS distribution/warehousing and equipment surplus as needed by local food companies such as Campbell's Soup and Progresso; resurrection of Money Talks Magazine (for which he'd been a founder and publisher in New York). T2, pp. 21-23. He would also demolish one and a half buildings to harvest the steel, which he estimated was worth between $800,000 and $1 million, at only a $250,000 cost to demolish. *Id.*, p. 23.

The CDL Agreement set the purchase price at $700,000 with a down payment of $25,000 to be held in escrow with CDL's title insurance company. Ex. P-4, ¶¶ 2, 3(a). At closing, CDL would pay $275,000, plus, if it so chose, assumption of the property taxes outstanding at the time of closing, with a credit against the purchase price of the outstanding property taxes as of January 1, 2014.[7] *Id.*, ¶ 3(b), (c). Any remainder owed would be included in a note and a mortgage on the property and paid semi-annually over three years with interest at 5 percent per annum. *Id.*, ¶ 3(d). The CDL Agreement disclosed existing liens and encumbrances as the property taxes and a mortgage in favor of Mr. Rock, which had been disclosed as in the amount of $332,429. *Id.*, ¶ 3(j); Ex. D-16. Despite this disclosure, the contract did not provide either for the assumption or the payment of the mortgage.

Closing on the CDL Agreement was to be held no later than 45 days from the execution of the agreement, "or at any other date as may be selected by the mutual agreement of Seller and Purchaser . . . ," *id.*, ¶ 3(k), though time was also made "of the essence." *Id.*, ¶ 4(d). Forty-five days would have been on or around February 23, 2015, but according to Mr. Brooks, the parties did not close on account of the "reluctance" of one of his funders regarding the back taxes. T2, pp. 15-16. Mr. Brooks had asked the City to allow him to pay the back taxes over 12 months, *id.*, p. 16, a request the City rejected via email on April 17, 2015. *Id.*, p. 25.

Nevertheless, on June 1, 2015, GGI and CDL amended the CDL Agreement. Ex. D-17 (the "First Amended CDL Agreement"). This amendment ratified the original agreement and added indemnification by GGI against any and all claims arising from any hazardous substances discharged "at any time up until the date of the Closing." *Id.*, ¶ 2. The First Amended CDL Agreement provided that to the extent GGI failed to so indemnify CDL, then CDL could deduct such costs against the mortgage payments owed by CDL. *Id.*, ¶ 3. The First Amended CDL Agreement also stated that the due diligence period had expired and would not be extended, and that the closing would be June 15, 2015 or earlier, at the buyer's discretion. *Id.*, ¶¶ 5, 6. That CDL further contracted with GGI and the amendment only concerned environmental issues suggests that the failure of the CDL Agreement to close had more to do with the remediation issues and nothing to do with the property taxes.

But the parties still did not close on the transaction. Rather, on August 15, 2015, GGI and CDL ratified the CDL Agreement and entered into another amendment. Ex. D-22 (the "Second Amended CDL Agreement"). The Second Amended CDL Agreement replaced the First Amended CDL Agreement, but included an environmental indemnification provision. *Id.*, ¶¶ 6-7. Under this agreement, CDL would pay at closing $25,000, plus an amount to pay the real estate taxes in full. *Id.* In addition, CDL was to pay half of GGI's legal and filing fees to GGI's bankruptcy counsel,

---

[7] It is not clear why taxes were to be apportioned as of the first of a year rather than on the closing date, or whether the parties meant the credit to be as of 2015 (or 2016) rather than 2014.

estimated to be $6,776, and half of "fees paid to Kinney [sic "Kenny"] Environmental Services, estimated to be $3,000." *Id.* CDL was also to execute a note and second mortgage (after Mr. Rock's) on the property, for the balance of the purchase price less $100,000, payable semi-annually and due one year from closing with interest at 5 percent per annum. *Id.* CDL would execute yet another note and third mortgage in the amount of $100,000, payable three years from closing with interest at 5 percent per annum. *Id.* (A requirement to pay the third mortgage semi-annually was crossed out and initialed. *Id.*) The closing date was changed to September 30, 2015. *Id.* Thus, using the $429,767 figure for the taxes, CDL would be allowed to stretch approximately $136,000 over the first year and pay $100,000 in the third year after closing.

Regarding the payment of GGI's bankruptcy counsel, this related to a chapter 11 bankruptcy case filed by GGI in this court through the Law Offices of Seymour Wasserstrum on June 25, 2015—after the First Amended CDL Agreement and before its June 15th closing date. *See* Bankr. No. 15-21939-ABA (the "2015 Bankruptcy"). This clause may have been drafted in haste, as the provision had the parties reversed: it stated that Seller (GGI) would make these payments on the Buyer's (CDL's) behalf. Ex. D-22. But Mr. Brooks testified that it was indeed the buyer's responsibility. T2, pp. 33-34. And in this instant chapter 11 case, GGI disclosed that it paid its prior bankruptcy counsel $6,717 on June 25, 2016 and a debt for "environmental services" payable to Kenny Environmental Services, LLC in the amount of $4,000. Ex. D-16 (SOFA and Schedule E/F).

Thus the list of errors/oddities in the various CDL agreements include: "time of the essence" despite moving the closing date several times; crediting taxes as of January 1, 2014; no provision for payment or assumption of Mr. Rock's mortgage; and the seller paying attorney and Kinney fees rather than the buyer. None of the agreements appeared to be drafted by an attorney, and all were signed by Mr. Nave. In addition, at 81 years old, T2, p. 21, Mr. Brooks had some difficult testifying. He did not recognize the First Amended CDL Agreement or the Second Amended CDL Agreement, *id.*, p. 26; and could not remember whether he knew that the City had filed a foreclosure action, *id*, p. 28; or what attorney Wasserstrum's involvement was, *id.*, pp. 33-34.

Two weeks before entry of the City's foreclosure judgment, on December 15, 2015, GGI entered into a contract with Anthony DeSantis of Brooklyn, New York, "as agent for an entity to be formed" for $530,000. Ex. P-6 (the "$530,000 Contract"). Mr. DeSantis testified that his main business is recycling plastic for other customers. T1, p. 26. He was interested in this property for its location near prospective workers and an existing bus stop, industrial water and sewer, heavy power supply, and rail access. *Id.*, pp. 26, 28-29, 40-41, 66. His immediate plan was to remodel some offices immediately and set them as a local headquarter for the entity. *Id.*, p. 32. He would remodel the nurses' station for a place for engineers to stay, and then work "around the clock" to get a couple of buildings up and secured to have a safe, secure place for storage. *Id.*, p. 32.

The contract called for a down payment of $50,000 with the balance of the $530,000 purchase price paid at closing. Ex. P-6, ¶ 5. It also provided for GGI to

> [p]rovide for payment of all outstanding liens, mortgages or other monetary encumbrance which are liens against the Property, including all real estate taxes or other amount levied upon the Property by any governmental agency which create or may create if unpaid a lien upon the Property, which payment may be made out of the Purchase Price to be paid at closing.

*Id.*, ¶ 14.2. Mr. DeSantis was granted a due diligence period until February 5, 2016. *Id.*, ¶ 8.1.

There was no explanation provided at trial for the fact that $530,000 would not cover both the real estate taxes and Mr. Rock's $332,429 mortgage. Possibly the provision was poorly drafted and was not intended to include the mortgage, or Mr. Rock agreed to take a loss.

GGI agreed as a condition of closing to comply with its ISRA obligations, including, prior to closing, obtaining a Remediation Certification, approval of a Remedial Action Workplan, or a waiver or other approval from the NJ DEP, as well as obtaining and maintaining a "Remediation Funding Source" approvable by a Licensed Site Remediation Professional or NJ DEP. Ex. P-6, ¶ 9.12. It also would assign to the purchaser the Glass Group Indemnification Agreement (to be discussed below). *Id.*, ¶ 9.13.

GGI did not inform Mr. DeSantis that it had outstanding property taxes or that the City had filed a complaint in foreclosure against it. This appears to be in breach of GGI's representation in the $530,000 Contract that it "represents that it has no knowledge of any pending or threatened litigation affecting the Property or Seller's interest in the Property and that Seller is not a party to any litigation affecting the Property." *Id.*, ¶ 9.9. Rather, Mr. DeSantis learned about the tax issue through his own due diligence. T1, p. 28. But before he could meet with the City, the City had foreclosed on the property. *Id.* While walking the property in January 2016, Mr. DeSantis ran into Joseph Sooy, one of the City's commissioners, and ". . . that's when [the City] became aware [of us] and we became aware of everything that was – what type of fiasco was going on." *Id.*, p. 42.

On March 17, 2016, after GGI had filed this bankruptcy case and this adversary proceeding, the $530,000 Contract apparently was mutually cancelled and Mr. DeSantis and Linda Salamon, "as agents for an entity to be formed," entered into a contract of sale with GGI to purchase the property for $690,000. Ex. P-7 (the "$690,000 Agreement").[8] Mr. Rock testified that the increased purchase price reflected the amount GGI owed in taxes, the $200,000 cost of an indemnification agreement, and administrative costs that GGI incurred in connection with the property. T1, p. 147. The court rejects this reason because GGI had already agreed to sell for $530,000—that Mr. Rock wanted more money is not grounds to void that contract in order to force a price increase, and Mr. DeSantis could have added Ms. Salamon as a member of the original "entity to be formed" rather than enter into a new agreement.

More credibly, Mr. DeSantis testified that he offered more to close quickly. "The increased price was our perception of the weights and balances where we would pay a higher price to close the property sooner" which would keep Ms. Salamon in the deal. T1, p. 38. Mr. DeSantis's "group" later—around July 2017—purchased the adjacent 27.56-acre property, a working glass factory known as Gerresheimer Glass, for $1.7 million (approx.. $61,683 per acre); at the time of the hearing, he had posted it for rent. T1, pp. 56, 58, 71, 85. Mr. DeSantis testified that the two properties share an internal fence and a rail line, and Gerresheimer has an easement to discharge water into Ada Pond, located on GGI's property. T1, p. 57. At the time of the trial, Mr. DeSantis appeared to still be interested in purchasing GGI's property, so likely the higher price also reflected the desire to own both parcels.

The $690,000 Agreement recited that "Upon execution of this agreement the amounts currently on deposit and held in escrow by Lincoln Land Services, LLC in the amount of $50,000

---

[8] At trial, Mr. DeSantis referred to Ms. Salamon as his "previous" or "former" investor, suggesting that she is no longer interested in the property. T1, pp. 34, 36.

shall be deemed the earnest money deposit under this agreement." Ex. P-7, ¶ 5.1(a). GGI did not disclose in this bankruptcy any interest in funds held in escrow, and there was no testimony regarding whether the $50,000 was paid. Ex. D-16.

The $690,000 Agreement required a cash payment of $100,000 at closing, plus an amount equal to the amount owed in taxes to the City prior to its foreclosure judgment, "and any other outstanding liens upon the Property including amounts owed for real estate taxes[,] water and sewer charges, etc., provided the aggregate amount does not exceed the Purchase Price. . . ." Ex. P-7, ¶¶ 5.1(a), (c). Any remainder owed would be paid pursuant to a promissory note payable three years from the date of closing at the rate of three percent per annum. *Id.*, ¶ 5.1(d). The agreement provided that the buyer could "withhold payment of principal and interest from the Seller in the event the Seller, its successor and or assigns (which shall include Buyer) are deemed liable for any environmental remediation relating to the Property. The Seller shall be allowed an offset directly against the principal and interest for any environmental remediation that the Seller, its successors and/or assigns are liable." *Id.* But with the City owed at least $400,000, Mr. Rock $332,429, and the $50,000 down payment and $100,000 cash due at closing totaling over $690,000, it seems that there would be no need for a promissory note, unless, again, the "liens" were not intended to include Mr. Rock's mortgage, in which case the closing price approximates $530,000.

The $690,000 Agreement provided for a closing date of April 15, 2016 "or such earlier date as Buyer and Seller may determine," ex. P-7, ¶ 7.1, even though GGI did not own the property at the time it executed this contract. Due diligence was to end March 31, 2016. Ex. P-7, ¶ 8.1.

The parties amended the $690,000 Agreement on May 13, 2016. Ex. P-11. The amendment added as conditions precedent the entry of an order of this court in this case approving the sale and the revesting of title to the property in GGI. *Id.*, ¶ 21.1. It extended due diligence to 15 days after satisfaction of the conditions precedent, and closing to 30 days after satisfaction of the conditions precedent. *Id.*, ¶¶ 7.1, 8.1.

Mr. Rock testified to one other possible sale of the property, but with little detail. He stated that at some time certain Chinese investors were told by the City that the City could sell the property to them cheaper than GGI could. T1, pp. 138-39. But the investors purchased property in North Jersey instead. *Id.* Mr. Rock stated that the price with the Chinese investors was whatever the taxes were plus $100,000. *Id.*, p. 139. Mr. Rock could not remember the names of these Chinese investors, *Id.*, p. 138, and did not produce any contract with them.

### The Condition of the Property

As previously stated, the Relevant Dates for valuation are December 31, 2015 and March 8, 2016 (though the parties ultimately did not differentiate their proffered values). Mr. Rock, Mr. DeSantis and Mr. Sooy testified regarding the condition of the property at various dates: Mr. Rock in November 2015, T1, p. 151; Messrs. DeSantis and Sooy in early January 2016, T1, pp. 42, 51-52; T2, p. 141; and Mr. DeSantis again around April 2016. T1, p. 52. Mr. Sooy had worked at Wheaton from 1986 to 1989, so as with Mr. Rock, he had some familiarity with the property. T2, p. 140.

In general, the court gained the sense that the 18-acre property has been continually deteriorating since the closing of the plant due both to age and vandalism. As industrial buildings, none sounded especially appealing in their current state, and any intact buildings would need

restoration—new drywall, painting, flooring, possibly window replacement—to be usable by a new owner.

According to the property record cards, T1, p. 91, the bulk of the buildings were built in the 1930s and 1940s, with one as early as 1924 and the most recent in 1977. Ex. P-20. The biggest example of the effects of age was the observation that the roof on a metal building was deteriorating prior to December 2015 and finally collapsed sometime after January 2016. *See* T1, pp. 30, 155; T2, p. 171. This was a building that Mr. Rock testified he had intended to take down to salvage the steel. T1, p. 155. Mr. Rock testified about steel being worth $820,000 as of the trial. T1, p. 156. He did not disclose it in the 2015 Bankruptcy because, he claimed, it is an "intangible asset" that would not be recorded on a balance sheet. *Id.*, pp. 176, 181.

Mr. Rock admitted that graffiti existed prior to December 2015, and he and other witnesses testified that it increased substantially after. *See* T1, pp. 31 (less graffiti before than after), 61-62 (no graffiti in the nurse's station); T2, pp. 150 (more graffiti between January 2016 and March 2016), 160 (more graffiti since December 2015). Similarly, testimony regarding windows noted them intact in certain buildings prior to December 2015 and January 2016, *see* T1, pp. 55, 61-62 (windows in nurse's station intact), 151 (windows in office building intact), but broken between January 2016 and March 2016. *See* T2, p. 150. Mr. Sooy also found the administrative building unlocked and "ransacked." *Id.*, p. 147.

Mr. Rock also testified that during GGI's ownership "There's been vandalism going on around those facilities for years, that's why all the fences have been around them. . . . There's constant vandalizing." T2, p. 178. That vandalism "for years" included theft of copper and transformers. T2, p. 176. *See* T2, p. 142 (testimony of Mr. Sooy that in January 2016, "large copper wires . . . they were all gone."). Messrs. DeSantis and Sooy were in agreement that all or most transformers were missing in January 2016. T1, p. 55; T2, p. 148.

Testimony was conflicting regarding water damage in the main administrative building. Mr. Rock testified that all water except for fire hydrants had been shut off long before 2015, T2, p. 177, but Mr. Sooy noticed a broken water pipe on his site visit in January 2016, and had the water department shut the water off. T2, pp. 147-48.

Mr. Rock testified positively about the quality of many of the buildings on site in November 2015. An office building had all of its windows, T1, p. 151; a finishing building built in 1989[9] and a so-called "quality" building in good condition, *Id.*, pp. 152-53, a maintenance shop in "move-in" condition. T1, p. 154. As industrial buildings, they mostly had concrete floors. *See Id.*, pp. 151-55 (maintenance building), 157 (small storage building); T2, p. 171 (metal building with roof collapse). The flooring in the office building had been removed for asbestos remediation, thus according to Mr. Rock needed carpeting, as well as the bathrooms "spruced up" and the ceiling tile removed. T1, pp 151-52.

Mr. DeSantis testified that "Some of the buildings were – the site was poor, but some of them were salvageable." *Id.*, p. 30. For example, he believed the nurses' station could "easily" be remodeled. *Id.*, p. 30. But regarding the condition one week after the City foreclosed, he stated "it was, obviously, not being maintained. . . ." *Id.*, p. 31. He also stated that he had had theft on the Gerresheimer property. *Id.*, p. 54.

---

[9] The court did not find any buildings built in 1989 on the City's property cards. *See* Ex. P-21.

In "Plant 1," Mr. Sooy, again, visiting in early January, described missing electrical bus, wires and cables; a deteriorating metal roof with holes in it; water in floor pits; holes in metal railings. T2, pp. 142-143. One side of the concrete batch house was cracked. T2, p. 144. Another building had mold, pigeon droppings and broken glass on the floor. T2, p. 144. It appeared to him that people had been living there, as he saw clothing, human feces, and glassine envelopes typical of drugs. T2, p. 144. The bathrooms there were destroyed. T2, p. 144. A building where glass had been molded was "wrecked," with parts of the metal ceiling falling in, no electrical bus, "holes and just a general state of disrepair." T2, p. 145. Another building had a homemade skateboard park with ramp made with plywood and other found material. T2, p. 147.

The City did some clean-up work on the property, e.g. cutting down trees in the alleyways to facilitate access to Rio Tinto for its environmental remediation work, putting steel plates over several floor pits at an alleged cost of $25,000-$30,000, and patching fences. T2, pp. 149-150. Regarding the fence patching, Mr. Sooy stated "We – we patched the fences where they were cut. Of course, they cut them again and we patch them again. It's an ongoing problem." T2, pp. 150-151. Mr. DeSantis confirmed this clean-up effort. T1, p. 55. The City did not repair roofs because, Mr. Sooy testified, "this stuff's shot. . . . Why would we spend the money to do it, and, second, we wouldn't know if we were investing to repair a roof in a property that we didn't own." T2, p. 169. As for the roof that had collapsed, he believed that it would have had to be replaced anyway; the building otherwise was "block and concrete." T2, p. 171.

## History of Environmental Issues

During The Glass Group, Inc.'s chapter 11 case, it entered into a Settlement Agreement and Release with Alcan Corporation. Ex. P-1. Its recitations provide some history of the environmental issues at the property. It states that through the September 5, 2002 asset purchase agreement ("APA") between Alcan and The Glass Group, Wheaton (later Alcan) had affirmed its sole responsibility for complying with legal obligations under the Industrial Site Recovery Act ("ISRA") to the satisfaction of the New Jersey Department of Environmental Protection ("NJ DEP"), and agreed in the APA to indemnify The Glass Group. *Id.*, p. 1.

On September 29, 2002, pursuant to the ISRA, Wheaton entered into a Remediation Agreement with the NJ DEP to remediate the property. *Id.* On October 7, 2005, pursuant to ISRA, The Glass Group entered into a remediation agreement with NJ DEP in connection with a sale by it of Lots 5 and 7 to Kimble Glass, Inc., whereby The Glass Group agreed to complete all applicable ISRA program requirements to remediate the "Millville industrial establishment." *Id.* On November 7, 2005, The Glass Group established a trust fund of $100,000 as a remediation funding source. *Id.*

Then on July 14, 2006, The Glass Group asked for a Remediation in Progress Waiver (RIPW"). *Id.*, p. 2. The NJ DEP had alleged that hazardous substances were discharged into Ada Pond and into soil during Alcan's and The Glass Group's periods of ownership. *Id.* The Glass Group entered into an amendment to its remediation agreement with the NJ DEP, effective August 30, 2006, in connection with its sale to GGI of Lot 1, where The Glass Group agreed to complete all of its ISRA requirements under the October 7, 2005 remediation agreement. *Id.*, p. 1.

On February 8, 2011, The Glass Group's chapter 11 plan administrator entered into a Settlement Agreement and Release with Alcan wherein, "to avoid the expense of adversarial

proceedings to determine the timing of certain 'Escapes' and the extent to which such pollution or contamination at the Millville Glass Plant was caused before or after the Closing Date [of the sale,]" Alcan agreed to take over The Glass Group's obligations under certain ISRA cases. Ex. P-1 ("Glass Group Indemnification Agreement"). In consideration, The Glass Group would ask the NJ DEP to release the $100,000 trust fund to The Glass Group and approve its RIPW. *Id.*, ¶ 2, and would pay Alcan $200,000. *Id.*, ¶ 3. Alcan then agreed to defend, indemnify and hold harmless The Glass Group and successors, from all liabilities in connection with The Glass Group's remediation agreement, any natural resource damages related to the Millville Glass Plant, and Alcan's assumption of The Glass Group's ISRA obligations. *Id.*, ¶ 5. Assignment by either party of the obligations would require the prior written consent of the other party, "which consent shall not be unreasonably withheld." ¶ 16.

That the Glass Group Indemnification Agreement is limited in scope is evident by review of an Administrative Order and Notice of Civil Administrative Penalty Assessment issued by the NJ DEP against GGI, signed by Mr. Nave on August 4, 2011, regarding violations of the Solid Waste Management Act. *See* ex. D-16. This agreement states that GGI "failed to determine if numerous containers (drums, sacks, pails, bottles, etc.) of solid waste were hazardous. Many of these containers were storing unknown and/or unlabeled contents at the time of the investigation. Several containers of poor condition (missing bung caps and/or lids, severely corroded, etc.) were also observed at the former glass manufacturing facility." *Id.*, ¶ 2. The NJ DEP concluded that GGI corrected the violation and imposed a penalty of $5,000. *Id.*, ¶ 3(a).

Interestingly, GGI only had to pay half of the penalty, claiming hardship. "Co-Owners of GGI Properties provided hardship documentation that they continue to pay property taxes but yet No [sic] income is being generated from the property in question. And, with the current economic climate being what it is, the co-owners are also having problems in selling said property." *Id.* Part of this statement is false, as in 2011 GGI did not pay property taxes, as it had not since 2009.

By yet another agreement made August 20, 2014, between Alcan and GGI, Alcan reaffirmed its ISRA obligations in connection with Lot 1, including agreeing to indemnify GGI, while GGI agreed to provide access to the property for the remediation. Ex. P-2 ("GGI Access Agreement"). The agreement was limited to the ISRA obligations of the Glass Group Indemnification Agreement, excluding "any obligations pertaining to releases of hazardous substances that may have occurred after GGI took title to the Property." *Id.*, ¶ 1. In addition, GGI agreed to comply with any reasonable restrictions to the property necessary for Alcan to comply with its ISRA obligations. *Id.*, ¶ 6. GGI further agreed, following issuance of an RAO ("Response Action Outcome") to ". . . not disturb any remedial action implemented by Alcan . . . ." Also, Alcan "shall perform . . . (iv) any and all investigation, mitigation, and/or remedial obligations, to the extent such obligations arise from a change in the use and/or the development of the Property, including but not limited to obligations pertaining to vapor intrusion, not previously required, if buildings are constructed or substantially renovated on the Property." *Id.*, ¶ 13.

The GGI Access Agreement further provided that if GGI sold the property, its buyer must assume and comply with GGI's obligations under the agreement and that Alcan could enforce the agreement against that party. *Id.*, ¶ 15. But "Neither the delivery of such undertaking from the third party, nor the conveyance, transfer, or assignment by GGI of a property right or interest in the Property shall relieve GGI of its obligations under this Agreement." *Id.*, ¶ 15.

Finally, GGI was required to record Exhibit A to the agreement, a Notice of Environmental Conditions and Release, as a covenant that would run with the land. *Id.*, ¶ 16. That notice provided, *inter alia*:

> POST REMEDIATION MAINTENANCE AND REPORTING. GGI has assumed responsibility to perform all post Remedial Action Outcome requirements necessary to maintain the remedial action implemented by Alcan, including without limitation post remediation maintenance and reporting obligations associated with any Remedial Action Permits or similar authorizations issued or required by any governmental entity.

> AGREEMENT. This document provides notice to all subsequent owners and lessees of the Property of the existence of the Agreement between GGI and Alcan, and the obligation of GGI to require as part of any sale and/or transfer of ownership of other rights to use the Property that each buyer and/or transferee provide Alcan with a written agreement to assume the obligations of GGI under the Agreement and that Alcan shall be entitled to enforce the Agreement against such buyer and/or transferee.

*Id.*, ex. A.

On March 13, 2015 GGI notified the NJ DEP of a release of hazardous material at Ada Pond. Ex. D-16 (SOFA ¶¶ 23-24). Note that this release occurred after GGI entered into the CDL Agreement and before it entered into the First Amended CDL Agreement, further supporting that environmental issues were the cause of the failure to close the CDL Agreement.

On February 21, 2017, the City and Rio Tinto entered into an Environmental Obligations and Access Agreement similar to the GGI Access Agreement. Ex. D-19 (the "City's Environmental Agreement"). This agreement reaffirmed Rio Tinto's obligations and granted access to the property by the City. *Id.* It similarly excluded releases of hazardous substances that may have occurred after GGI took title. *Id.*, ¶ 1.

The City's appraiser, J. Paul Bainbridge, testified that there are still 14 areas of concern as far as environmental contamination on the property. T2, p. 50. The remediation work on Ada Pond has continued into 2017, so it is still an issue. T2, p. 125. Mr. Sooy at trial also stated that a contractor for Rio Tinto was at the property almost every day, working on dredging the bottom of Ada Pond. T2, p. 148.

Mr. Magazzu, attorney for Mr. DeSantis to effectuate the purchase of the property, signaled that the environmental issues might be a concern by testifying that while he anticipated his clients' project being up and running three years after getting construction approvals, ". . . the property has some environmental issues that have to be -- would have to be taken into consideration. I don't know how much that would lengthen the time to get approvals and to move forward." T1, p. 12.

### The City's Appraisal

The City argued that the property is worth less than $0, based on its appraisal valuing the property as of July 27, 2016 as nominal. T2, p 64. In coming to that conclusion, Mr. Bainbridge reviewed the Kay Appraisal, and on July 27, 2016, inspected the property with the City's engineer. *Id.*, pp. 47, 74. He described the improvements on the property as in dilapidated condition, and therefore determined that the highest and best use for the property was tear down and redevelopment. *Id.*, pp. 48, 56-57. Accordingly, he only valued the property as vacant land.

Because Mr. Bainbridge found no sales of comparable vacant land, he instead applied what he conceded is a less-preferred market extraction method of appraisal, looking at seven improved industrial properties and subtracting out the value of the improvements. *Id.*, pp. 58, 70, 117. He considered sales made from 2012 to 2016, and did not make any adjustment in value for time because, the market having been so depressed, the value would be lower at the Relevant Dates. *Id.*, pp. 62-63. He estimated the unimpaired land value at $200,000. *Id.*, pp. 63-64. But because of an estimated cost of demolition of just under $1 million, the property's value was nominal. *Id.*, pp. 61, 64.

Significant to Mr. Bainbridge was the environmental issues of the property.[10] He stated that ". . . what is common for a contaminated property is that it really becomes unsaleable until there's a no-further action letter [from the DEP]." T2, p. 52. "A bank would not finance a purchase without a no-further-action letter." *Id.* While he conceded that Rio Tinto is paying for certain clean-up, he stated that he was concerned about the time to complete the remediation. T2, p. 50. He believes that the easement to Gerresheimer to dump into Ada Pond, a potential future liability, and the requirement that the property receive a no-further-action letter from the DEP, represent environmental stigmas pushing the property value down. T2, p. 68. He noted that the Kay Appraisal had stated that a $500,000 contract failed in part on concern about that easement, referring to Ada Pond as a "deal killer" because of the easement's potential for future contamination. T2, p. 125. As Rio Tinto is still working on the pond in 2017, he believes it is still a concern. T2, p. 125.

Mr. Bainbridge also criticized the Kay Appraisal as valuing the 90,000 square feet of salvageable improvements at $2-$5 per square foot without accounting for the cost to renovate. T2, pp. 76, 94, 120-21. Mr. Bainbridge did not consider any salvageable steel value because the estimated $1 million cost of demolition and asbestos removal that the City provided him would dwarf the value of any steel. T2, p. 64. He did not use the lower demolition cost estimate included in the Kay Appraisal because it was dated and did not quantify the salvageable steel value. T2, pp. 108-109. He testified that the Kay Appraisal "made a strong argument that the property was in bad shape." T2, pp. 113-14.

### This bankruptcy case

GGI filed its second bankruptcy case on March 8, 2016 (Bankr. No. 16-14323-ABA, the "2016 Bankruptcy") and this adversary proceeding on March 15, 2016. GGI owns no real property and conducts no business. Ex. D-16. This lawsuit is its only asset, although the Statement of Financial Affairs disclosed that GGI sold $10,000 worth of assets in 2014 and had $51.97 in a bank account around the time of the transfer. *Id.*

GGI disclosed $372,537 in unsecured claims. *Id.* Giordano Vineland Scrap Material, LLC was disclosed as being owed $879, and Kenny Environmental Services, LLC as owed $4,000. *Id.* In addition, the State of New Jersey filed a proof of claim alleging a $1,078 claim, and the United States Trustee will have a claim for quarterly trustee assessments. The remainder of the creditors' claims are disclosed as being based on loans to GGI: Mr. Rock, $7,000; Mr. Rock, $332,429; Mr.

---

[10] Contrary to GGI's assertion, Mr. Bainbridge did address environmental stigma in his appraisal report (*see* p. 67), thus this testimony was admissible.

Nave, $19,717; Linda L. Nave (Mr. Nave's wife, T2, p. 8), $2,700; NARO Properties, LLC (owned by the Nave Family Revocable Trust and Mr. Rock, T2, p. 8), $5,590; and RONA Group, LLC (same, *Id.*, p. 8), $222. *Id.* Mr. Rock lists an address of 218 Elm Street, Versailles, Kentucky, while the others list the 1041 Cedar Ridge Lane, Versailles, Kentucky that is the mailing address of GGI. *Id.* Mr. Rock has declared that he will subordinate his $332,429 note and mortgage to all administrative fees, legal fees and unsecured claims filed or arising in this case. Doc. 19-1, ¶ 4. The City alleged that as of March 1, 2017, $514,875 would be owed on its claim. Doc. No. 18-1, ¶ 7.

After a trial held November 15 and 16, 2017, and submissions by both parties, the matter is ripe for adjudication.

## IV.    DISCUSSION

### Count One - Section 548

As stated in the prior opinion in this case, for the purposes of 11 U.S.C. § 548(a) there has been a transfer to the City of an interest of GGI in property within 2 years before the date of the filing of the petition. *In re GGI Properties, LLC*, 568 B.R. at 241. As also stated in that opinion, to prove a constructively fraudulent transfer under section 548, GGI also needs to prove that it did not receive reasonably equivalent value to the $429,767 debt extinguished by the transfer and that GGI was or became insolvent as a result of the transfer. In determining reasonably equivalent value, the Third Circuit has considered the totality of the circumstances, including the fair market value of the benefit received, the existence of an arm's-length relationship between GGI and the City (previously determined to exist, *id.* at 250) and the City's good faith *Id.* (citing *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)). These factors were more important in *Fruehauf* where the subject transfer was an amendment to a pension plan and "[c]alculating 'direct' benefits (such as an investment of cash that yields a cash return) is typically easy, but becomes more difficult when benefits are 'indirect.'" *Fruehauf*, at 213.

Fair market value "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). *See In re Greater Se. Cmty. Hosp. Corp. I*, 02-02250, 2008 WL 2037592, at *8 (Bankr. D.D.C. May 12, 2008) (same); *Estate of Theodore Warshaw v. Director, Div. of Taxation*, 26 N.J. Tax 358, 368-69 (2012) (same); *Dworman v. Borough of Tinton Falls*, 1 N.J. Tax 445, 454 n. 4 (1980) (same); *In re Mocco*, 222 B.R. 440, 456 (Bankr. D.N.J. 1998) (value is determined by ascertaining "the price which would be obtained at a fair sale between a willing buyer and seller.").

In determining fair market value, this court also appreciates that the New Jersey Tax Court maintains that a sale may be "a reliable indicator of fair market value" if:

1) buyer and seller are typically motivated and neither is under duress;

2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;

3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;

4) the purchase price is paid in cash or its equivalent; and

5) the purchase price is unaffected by special or creative financing or by other special factors, agreements or considerations.

*The Appraisal of Real Estate, supra,* at 18-22; Appraisal Institute, *The Dictionary of Real Estate Appraisal* 222–23 (3d ed. 1993).

*Hull Junction Holding Corp. v. Princeton Borough,* 16 N.J. Tax 68, 94 (1996).

GGI bears the burden of proof by a preponderance of the evidence. *In re GGI Properties, LLC,* 568 B.R. at 251. This standard is defined as "Evidence which is of greater weight or more convincing than the evidence [that] is offered in opposition to it; that is evidence [that] as a whole shows that the fact sought to be proved is more probable than not." *Greenwich Collieries v. Dir., Office of Workers' Comp. Programs,* 990 F.2d 730, 736 (3d Cir. 1993), aff'd sub nom. *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267 (1994) (quoting *Black's Law Dictionary* 1182 (6th ed. 1990)). "[A] party proves a fact by a preponderance of the evidence when [it] proves that the fact's existence is more likely than not." *Greenwich Collieries v. Dir., Office of Workers' Comp. Programs,* 990 F.2d at 736. *See Matter of Crisp,* 82-02162-2-3, 1986 WL 22357, at *1 (Bankr. W.D. Mo. Oct. 27, 1986) ("It is 'only necessary that the circumstances established by the evidence be such as would lead a reasonably prudent man to that belief.'") (quoting *Brown Shoe Co. v. Carns,* 65 F.2d 294, 297 (8th Cir. 1933)). The court explains this standard as it found much of the proffered evidence lacking, on both sides.[11]

Ultimately, the court finds that the most probable fair market value was reflected by the $530,000 Contract. It was an unconsummated contract, not merely an offer; the buyer was to pay cash, no creative financing. It acknowledged the environmental issues and provided for indemnification. It agreed to purchase "as is." Mr. DeSantis was motivated to purchase the property. The property had been exposed to the market since 2009 when it had been listed at $1,649,000 but did not sell. It is not known whether Mr. DeSantis was aware of Mr. Rock's alleged mortgage, but the $530,000 Contract did not require payment of any liens. Similarly, though he did not know about the outstanding taxes, those were allocated to GGI through a customary "to be adjusted as of the closing date" clause. *See* Ex. P-6, ¶ 7.3. Having been entered into just two weeks prior to the transfer of the property, this contract provided the only settled value then, and to be explained, at the time of the bankruptcy filing.

Generally, unaccepted offers are not admissible evidence in support of fair market value of property, *Matter of Burns,* 73 B.R. 13 (Bankr. W.D. Mo. 1986), but unconsummated contracts are.

In "the absence of a completed sale, evidence of the price agreed upon in a binding contract of sale for property between the owner and a purchaser, both acting in good faith, would be of substantial significance in arriving at the fair market value of such property.'" *Little Egg Harbor, supra,* 316 N.J. Super. at 281, 720 A. 2d 369 (quoting *City of East Orange v. Crawford,* 78 N.J. Super. 239, 244, 188 A. 2d 219

---

[11] GGI in the 2015 Bankruptcy did not disclose either the executory contract with CDL or its interest in any down payment held in escrow. In this case, GGI did not disclose in this bankruptcy any executory contract with Mr. DeSantis or any interest in the $50,000 down payment that was to be made upon the signing of the contract. Nobody testified that Mr. DeSantis made the $50,000 down payment under the $530,000 Contract. GGI apparently told the NJ DEP that it was paying property taxes when it was not. These issues reflected poorly on GGI's credibility.

(Law Div. 1963)). "The fact that a contract is unconsummated does not *ipso facto* render the contract inadmissible to establish a property's fair market value." *Little Egg Harbor, supra,* 316 N.J. Super. at 281, 720 A. 2d 369.

*Gale & Kitson Fredon Golf, L.L.C. v. Twp. of Fredon,* 26 N.J. Tax 268, 287 (2011). Thus, unconsummated contracts have evidentiary weight.

Importantly, had Mr. DeSantis *only* entered into the $530,000 Contract, the court may have been inclined to discount it as untested by due diligence. But he returned—with more money and another investor—effectively ratifying his earlier offer without suggesting that the property was worth any more than his original offer. Rather, he offered more solely to close more quickly, incentivized by his desire to own both this and the Gerresheimer tract and to keep Ms. Salamon in the deal. While the $690,000 purchase price included an unsecured note for the balance owed after the closing date, as explained above, there would be no balance since $690,000 would not cover $150,000 plus the City's prepetition and postpetition tax claim and Mr. Rock's mortgage. Alternatively, if Mr. Rock's mortgage was not intended to be included in the liens to be paid off at closing, then, as the City argued (*see* Doc. No. 48, p. 17), the majority of the increase was contained in this unsecured note, further supporting that the "real" price was $530,000. By the time of the $690,000 Agreement, Mr. DeSantis knew the City had foreclosed, thus he understood the ownership contingency.

In coming to this conclusion, the court acknowledges that with a foreclosure judgment looming at the time of the $530,000 Contract, GGI was under a compulsion to sell. Though "distress" sales usually result in a price lower than fair market value, *see Tedesco v. Montclair Twp.,* 21 N.J. Tax 95, 99 (Super. Ct. App. Div. 2003), here the court believes that, for once, GGI accepted only what it could get. At $530,000, GGI would not get covered both the taxes and Mr. Rock's loan, neither of which have anything to do with the value of the property. GGI rushed this contract, falsely warranting that there was no pending litigation involving the property. In contrast, as to CDL, $700,000 was more than the market could bear, with Mr. Brooks unable to get his financers to close. And after GGI's 2016 Bankruptcy filing (which it may not have informed Mr. DeSantis about), GGI felt free to negotiate again, pushing the price up to cover its losses again.

That Mr. DeSantis agreed to increase the price reflected his desire to own both parcels. But so-called assemblage prices generally do not reflect fair market value. *See The Appraisal of Real Estate,* pp. 363-64 (Appraisal Institute, 14th ed. 2013) ("Certain parcels can achieve a higher value as part of an assemblage. . . . [A] buyer who purchases a site with the intent to assemble it with other parcels might have to pay a higher-than-market value for that site . . . . [Appraisers] should avoid assigning the unit value of the whole to the components without other market evidence to support those conclusions."). *City of Atlantic City v. Director, Div. of Taxation,* 24 N.J. Tax 1, 14 (2008) (rejecting assemblage sale, i.e., contiguous tracts acquired to form one single unit, from calculation of director's chapter 123 tables as adding "significant value to the adjacent property not reflected in the assessment of the combined tract.").

The City complains that the contracts were full of contingencies: due diligence, environmental certifications, ownership returned to GGI. Indeed, ". . . an unconsummated contract is entitled to little or no weight in the absence of key information showing the likelihood that it is capable of being enforced." *In re Mocco,* 222 B.R. at 463. Thus the more contingencies, the less weight to be given to the agreed-upon price, as the parties have reserved the opportunity to avoid the contract.

"If an agreement is so replete with contingencies . . . [s]uch contracts are not really contracts at all but are better characterized as offers or options to purchase which deserve little or no weight in the valuation process." *Id.* at 331–32. However, if "a litigant establishes evidence to support a finding of a 'reasonable probability' or 'likelihood' that the contingencies would be fulfilled, then the contract's relevance and admissibility would be established." *Little Egg Harbor, supra,* 316 N.J. Super. at 281, 720 A. 2d 369.

*Gale & Kitson Fredon Golf, L.L.C. v. Twp. of Fredon,* 26 N.J. Tax at 287-88. *See Lentz v. Mason,* 32 F. Supp. 2d 733, 743 (D.N.J. 1999) (holding that even failed sale contracts constitute admissible evidence of fair market value); *Merck Sharp & Dohme Corp. v. Twp. of Readington,* 004383-2016, 2016 WL 7429520, at *4 (N.J. Tax Ct. Dec. 22, 2016) ("The contract, which contains a sales price negotiated by market participants, surely contains information relevant to the true market value of the subject property."); *Jersey City Redevelopment Agency v. Weisenfeld,* 124 N.J. Super. 291, 294 (App. Div. 1973) (stating that "in the absence of a completed sale evidence of the price agreed upon in a binding contract of sale for property between the owner and a purchaser, both acting in good faith, would be of significance in arriving at the fair market value of the property") *City of E. Orange v. Crawford,* 78 N.J. Super. 239, 245 (Law. Div. 1963) ("Evidence of the price at which one claiming compensation for lands taken has formally bound himself to sell the lands in question to a third person, at least equals in relevancy evidence of the sale price of comparable lands.").

The court in *Linwood Properties, Inc. v. Borough of Fort Lee,* 7 N.J. Tax 320 (Tax 1985), gave as examples conditioning a contract on "receiving final approvals for subdivision, site and building plans, installation of sewer facilities, adequate utilities and any and all other necessary governmental applications. Additionally, the contract provided for very unusual financing." *Id.,* at 332-33. The court emphasized that it must thoroughly review an unconsummated contract of sale "and the circumstances surrounding its execution" to determine whether "it is replete with contingencies and is in fact nothing more than an offer or option to purchase, [in which case] the contract must be disregarded and given no probative effect." *Id.,* at 333. The *Mocco* court rejected evidence of an unconsummated contract because the court had not been provided a copy of the 11-year old contract to determine whether it had any contingencies.

Thus, while the City makes a fair legal point, it also supports the court's targeting the $530,000 value. The due diligence contingency ended in February prior to the price increase in March. Though the $530,000 Contract required GGI to comply with its ISRA obligations such as to permit sale, the City did not question GGI's ability to comply with this condition, and Mr. DeSantis was seemingly unconcerned enough about it to recruit additional financing to re-contract. At the time of the $530,000 Contract, GGI owned the property, and Mr. DeSantis only conditioned closing on due diligence.

In arriving at a $530,000 value, the court includes no value to any salvageable steel on the property. Mr. DeSantis expressed no interest in it, GGI did not disclose its value in its 2015 bankruptcy filing, and Mr. Rock's explanation that he did not consider it an asset because it was an intangible is nonsense: One, steel is not an intangible, and two, intangible assets still must be disclosed. As a former CEO, certainly he understands that. While Mr. Brooks stated that he worked in demolition, he was not qualified as an expert, *see* Fed. R. Evid. 702, and otherwise his testimony was confused. Mr. Brooks testified that he planned to salvage the steel for a net of $550,000 to $750,000, but if so, then query why he was not able to close the deal. Similarly, if the net value of the steel was so high, it is inconceivable that GGI would not have sold it to pay the taxes to prevent

foreclosure. *See In re Durso Supermarkets, Inc.*, 193 B.R. 682, 709 n.23 (Bankr. S.D.N.Y. 1996) (wondering, if it believed there was any value in the equipment and inventory, why the plaintiff did not remove it). GGI improperly proffered a demolition estimate allegedly stated in minutes of the City's Industrial Commission. Nobody presented the court with credible evidence, by expert or otherwise, of an estimate of the amount of steel and a price per pound as of the Relevant Dates.

The court also does not increase the contract price for the $200,000 ascribed to the Glass Group Indemnification Agreement, as GGI agreed in the $530,000 Contract to assign it to the buyer, therefore it was accounted for in the price.

The court cannot take into account the $61,683 per-acre price of the Gerresheimer property, since it has no evidence as to the condition of that property such as the comparability of usable improvements (Mr. DeSantis testified that it was a working glass factory), or its environmental condition, and because the purchase occurred in 2017, remote in time to the Relevant Dates.

The court also attaches little weight to CDL's $700,000 offer. Mr. Brooks did not testify as to how he came up with that price. GGI's appraisal estimated the value just three years earlier at $300,000-$600,000, and nobody testified that the property had increased in value since then. The $700,000 Agreement also was not a cash offer, instead providing for an unsecured note for the balance of the price after payment of only $275,000 at closing. There also was no credible reason given for its failure to close. GGI argued that it was the City's fault for not letting CDL pay the taxes off over time. But CDL entered into two amendments of the sale contract after being notified of that refusal, both with stated closing dates with "time of the essence." The court supposes that the price was too high for Mr. Brooks to find investors.

What of the $600,000 assessed value? First, that the $600,000 came about by way of settlement does not mean that it did not reflect fair market value in 2012. Though the City is correct that, in general, settlements are not subject to judicial estoppel, settlements in Tax Court are different. *City of Atl. City v. California Ave. Ventures, LLC*, 23 N.J. Tax 62, 66 (Super. Ct. App. Div. 2006). Tax settlements must be approved by the County Board of Taxation, with a judgment entered. N.J.A.C. 18:12A-1.9(i). The settlement request must include the basis for the settlement and indicate whether the municipality's assessor agrees with the settlement. *Id.* If the board approves the settlement, it enters judgment on the papers; if not, it notifies the parties and schedules a hearing date for the appeal. *Id.* Indeed, Rule 8:9-5 provides as follows:

> Judgment pursuant to stipulation: Judgment in a local property tax matter may be entered upon stipulation of the parties supported by such proof as the Court may require.

N.J. Ct. R. 8:9-5. Those facts might include "examination of the value and proper assessment of the properties, . . . analysis, information and appraisals. . . ." *City of Atl. City v. California Ave. Ventures, LLC*, 21 N.J. Tax 511, 519 (2004) (quoting Pressler, *Current N.J. Court Rules*, comment 4 on Rule 8:9-5 (2004)).

"For that reason, such judgments are treated as adjudications on the merits." *City Of Atl. City v. California Ave. Ventures, LLC*, 23 N.J. Tax at 66. ". . . [W]hile a settlement of a pending action is something less than a 'hearing and determination,' it is much more than a withdrawal. It demands an action by the county board a review of the settlement or a taking of testimony in settlement of the appeal, a filing of the stipulation, the entry of a judgment thereon. It requires an

action, albeit not a hearing and not a determination, by the county board in its quasi -judicial capacity." *Curtiss Wright Corp. v. Wood-Ridge Borough*, 4 N.J. Tax 68, 79 (1982).

Accordingly, the City is estopped from arguing that the $600,000 settlement figure was the product of a cost/benefit litigation analysis rather than reflecting the fair market value as of October 1, 2011. *See Rosenberg v. S. Orange Twp.*, 8 N.J. Tax 1, 4 (1983), *appeal granted, cause remanded sub nom. Rosenberg v. Twp. of S. Orange*, 93 N.J. 279 (1983) (rejecting settlement at $320,000 based on the taxpayer's appraisal report and the desire to avoid litigation costs, where the assessor did not concur in the settlement and an updated appraisal valued the property at $343,000). However, the estoppel effect of the 2012 settlement only applies to 2012. Thereafter, the assessed value could be rebutted by the City were the condition of the property to change.

GGI then cites N.J.S.A. 54:4-23 for the proposition that an assessor has a duty to maintain assessments at "the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract. . . ." This "assessment maintenance . . . involves an assessor's annual review of the district's tax roll, at which time the 'assessor changes some assessments in a year when district-wide revaluation or reassessment is not performed.'" *City of Elizabeth v. 264 First St., LLC*, 28 N.J. Tax 408, 426 (2015) (quoting *Regent Care Center, Inc., supra*, 362 N.J. Super. 403, 411-412 (App. Div. 2003)). An assessor noticing that assessments "in one portion of the taxing district are generally too high or too low" may adjust those assessments "to bring them into line." Handbook for New Jersey Assessors, ¶ 901.09. *See Regent Care Ctr., Inc. v. Hackensack City*, 362 N.J. Super. at 416. This includes increasing or *decreasing* assessments. N.J.S.A. 54:4-23 ("when the assessor has reason to believe that property comprising all or part of a taxing district has been assessed *at a value lower or higher than is consistent with the purpose of securing uniform taxable valuation of property* according to law for the purpose of taxation, . . . the assessor shall, after due investigation, make a reassessment of the property in the taxing district that is not in substantial compliance[.]") (emphasis supplied); N.J.S.A. 54:4-35.1 (providing for adjustment of assessment "[w]hen any parcel of real property contains any building or other structure which has been destroyed, consumed by fire, demolished, or altered in such a way that its value has materially depreciated. . . ."). "Legitimate reasons to revalue the property include increased property value based on new improvements; addition of formerly-exempt property; and reassessment of apartments converted to condominiums." *Schumar v. Borough of Bernardsville*, 20 N.J. Tax 46, 52 (Super. Ct. App. Div. 2001) (citing *Twp. of W. Milford v. Van Decker*, 120 N.J. 354, 362 (1990)); Handbook for New Jersey Assessors, § 901.09 (2017) ("when a particular neighborhood changes; when value for a specific property type changes, such as commercial/industrial properties; when apartment properties are converted to condominiums; or when property is upgraded through new buildings or structures, additions or improvements."). [12]

---

[12] The City employs too broad a definition of spot assessment in its argument that its assessor could not change the assessment of just one property. Spot assessment refers to singling out one property for re-assessment due to its sale within the year, referred to as the "Welcome stranger" pattern. *Twp. of W. Milford v. Van Decker*, 120 N.J. at 361-62; *Mountain View Crossing Inv'rs LLC v. Twp. of Wayne*, 20 N.J. Tax 612, 620 (2003) (". . . a prohibited spot assessment occurs only when the assessor has no basis for revising the assessment other than a sale of the property. An assessor may revise assessments for "legitimate reasons" independent of a sale even in the absence of a municipal-wide revaluation."); *BASF Corp. Coating & Ink Div. v. Town of Belvidere*, 24 N.J. Tax 416, 420 (Super. Ct. App. Div. 2009); *Schumar v. Borough of Bernardsville*, 20 N.J. Tax at 52. *See* The Handbook for New Jersey Assessors ("It is important that the adjustments be applied on an area-wide basis. It is a mistake to adjust assessments only on properties which have sold. This is called "spot assessing" and is discriminatory."). That would not have been the case here.

GGI additionally argues that because tax assessments are presumed to be correct, the City cannot debate the $600,000 assessment in place as of October 1, 2015. The judicially-created "presumption of correctness" provides that original assessments and any county board judgments are presumed to be correct, with the burden on the taxpayer and the appellant, respectively, to prove otherwise. *Kazanchy v. Borough of Sea Bright*, 6 N.J. Tax 353, 362 (1983), *aff'd in part, remanded in part on other grnds*, 6 N.J. Tax 622 (Super. Ct. App. Div. 1984).

Even assuming this presumption applies here, rather than solely in New Jersey's tax court—indeed, for a taxpayer to insist that its property value is *higher* than that asserted by the municipality subverts the presumption's purpose—the presumption merely places the burden of proof on the plaintiff, where it is in most lawsuits. For example, in *Borough of Rumson v. Peckham*, 7 N.J. Tax 539, 549 (1985), the presumption was applied against the municipality because it sought to establish a value for the property that exceeded the value indicated by the judgment of the County Board of Taxation. Moreover, once the presumption is rebutted, a court may "consider the totality of the evidence presented without reliance on any presumption." *In re Curtis Papers, Inc.*, 2008 WL 2777277, at *3 (Bankr. D.N.J. July 17, 2008). GGI conceded this in its post-trial brief in stating that the presumption "can only be overcome via definite and certain competent evidence." Doc. No. 47, p. 13.

The court finds here that the $600,000 assessment was rebutted not only by the $530,000 Contract but by the continued deterioration of the property. The property has sat vacant for years. It was last only partially occupied in 2012. By agreement of GGI and the City, the assessed value of the improvements dropped from $2,285,000 in 2005 to $1,311,000 in 2007 to $234,900 in 2011. If, as GGI contended in 2012, the property's value could drop from $1,676,000 to $600,000 in two years' time, naturally it would not hold steady at $600,000 over the following four to five years.

While GGI complains that the City did not secure or repair anything during its ownership, it presented no evidence that it had maintained the property in any manner other than fencing. The owners of GGI reside in Kentucky, not in New Jersey available to make certain that the property is secured.[13] A roof that caved in would have caved in and the burst pipe would have burst, drug users and skateboard riders could get through fences, regardless of the owner. The City at least covered liability-begging holes in the floors. Mr. Rock admitted that transformers and copper have been removed over many years.

The photographs admitted into evidence show a decaying behemoth. Mr. Rock's testimony that the photos only showed the "bad" buildings carries no weight with the court since there was no reason GGI could not have offered its own photographs of these alleged move-in ready buildings. GGI's argument that the significant deterioration occurred solely after the City took possession due to its failure to adequately secure the property is unsupported.

The court assumes that GGI made a strategic decision not to submit an appraisal, as even in 2012 its own appraiser estimated that the value could be as low as $300,000 (which is less than the $365,100 historically attributed to just the land). This might reflect the biases inherent to property valuation, i.e., that parties' valuation arguments change depending upon the purpose of the valuation with taxpayers seeking low valuations and property sellers seeking high ones. That $300,000 value, GGI's failure to submit that or any appraisal, together with the passage of four

---

[13] The CDL Agreement (ex. P-4), the $530,000 Contract (ex. P-6), and the $690,000 Agreement (ex. P-7) all recite that 1041 Cedar Ridge Lane, Versailles, Kentucky, is GGI's principal place of business, rather than Millville.

years while the property lay vacant, leads the court to conclude that the property is no longer worth $600,000. If GGI is to hold the City to its settlement at $600,000, then certainly it cannot disavow that it argued in 2012 that the property might be worth half as much.

The court acknowledges that an assessor has a statutory duty to perform assessment maintenance, bu considering the property was left vacant the City more likely improperly rolled the assessments over from year to year. Though ". . . the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor's function[,]" *Tri-Terminal Corp. v. Borough of Edgewater*, 68 N.J. 405, 414 (1975),[14] it defies common sense that the value of this property's improvements did not gradually decline, rather than drop in value by approximately $1,000,000 every four of five years coinciding with tax appeals. *See Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 245 (2005) (applying "common knowledge, indeed common sense," court concluded that a future buyer would offer less for a vehicle if advised of a potential engine defect); *City of New Brunswick v. State Div. of Tax Appeals, Dep't of Treasury*, 39 N.J. 537, 551 (1963) (applying common sense of the situation). GGI put forth no evidence that its appeals were based on destruction of a portion of its buildings. *See* N.J.S.A. 54:4-35.1 (providing for re-assessment after a property owner provides notice that "any parcel of real property contains any building or other structure . . . has been destroyed, consumed by fire, demolished, or altered in such a way that its value has materially depreciated, either intentionally or by the action of storm, fire, cyclone, tornado, or earthquake, or other casualty . . . .").

Here, GGI entered into a sale contract with CDL in January 2015 for a sale price of $700,000 yet 11 months later, it was content to sell to Mr. DeSantis for $530,000. This too presumes a decline in value.[15]

---

[14] N.J.S.A. 54:4–23 requires the assessor to review the fair market value of "each parcel or real property" to determine what it would sell for on the prior October 1. Although "practicalities obviously preclude most assessors reviewing every assessment line item every year, there should nevertheless be alertness to changed valuation factors peculiarly affecting *individual* properties . . . requiring prompt revision of such assessments . . ." *Tri–Terminal Corp.,*, 68 N.J. at 413-14 (emphasis supplied); *see In re Curtis Papers, Inc.*, 2008 WL 2777277, at *4 ("Although such 'roll overs' are an economic reality in most towns, that does not mean that such actions comply with the statutory mandate of N.J.S.A. § 54:4-23."). In performing their duties, assessors must promptly address assessment changes to "individual properties," because a system which promotes "carrying over of assessments each year . . . is not the proper discharge of the assessor's function." *Id.*

Ideally, the annual assessment list of every municipality would reflect that full and fair value every year, but the "practicalities obviously preclude most assessors reviewing every assessment line item every year." *Tri–Terminal Corp. v. Edgewater Bor.*, 68 N.J. 405, 414, 346 A.2d 396 (1975). Accordingly, the Supreme Court of New Jersey has recognized that assessors must be alert to changed valuation factors "peculiarly affecting individual properties in years between revaluations" and make the appropriate adjustments "in fairness to the particular taxpayer or to the taxing district." *Ibid.*

*Chadwick 99 Associates v. Dir., Div. of Taxation*, 23 N.J. Tax 390, 413 (2007).

[15] The court also rejects the assertion that the actual deemed value of the property for 2016 would be $652,245 because the ratio of actual to assessed values in the City was 91.99 percent in 2016. That ratio is an average of the true value, as measured by the sales for fair market value in the preceding year, to the assessed value of those properties. *See* N.J.S.A. 54:1-35.1, *et seq.* This ratio is used to calculate and apportion inter-municipal county and school tax burdens. N.J.S.A. 54:1-35.1; N.J.S.A. 54:1-35.40. It does not mean that *every* property is worth 8.01 percent more, but that those that were sold in the past year sold for 8.01 percent more than their assessed value. *See Tri-Terminal Corp. v. Borough of Edgewwater*, 68 N.J. at 410 n. 3 ("[The Director's sales ratios] prime value lies in estimating Aggregate true values of ratables in a municipality and average ratios of Aggregated assessed valuations to true values, not in

The court also rejects the City's estimate of nominal, as based on the assumption that the property only has value as vacant land,[16] ignoring the value of the rail access, industrial power, sewer and water supply, available work force, bus stop and minimal improvements that attracted Mr. DeSantis to the site, as well as a value effective as of July 2016 instead of either of the Relevant Dates three to six months prior.[17] Mr. Bainbridge's contention that the property is unsaleable due to the environmental contamination was rebutted by the sale offers with their provisions for indemnification. In addition, since at least 2005, the land alone has been assessed at $365,100, despite this environmental contamination. *See In re Curtis Papers, Inc.*, 2008 WL 2777277, at *6 (finding that the "impediments to redevelopment," including environmental contamination and asbestos removal, "were in existence during the tax years at issue."). One might even argue that the property will increase in value as remediation continues. *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 387 (3d Cir. 2013) ("Because of the contamination, the Litgo Property is currently unusable and cannot be developed. If the land could be developed after remediation, it would increase its value, and the Litgo Appellants are the only parties that stand to benefit from such an increase."); *see* N.J.A.C. 18:12A-1.14(j)(3)(viii) (providing for changing an assessed value without the filing of a compliance plan when, *inter alia*, the assessed value changes due to removal of contaminated soil and property remediation); *Borough of Paulsboro v. Essex Chem. Corp.*, 427 N.J. Super. 123, 131 (App. Div. 2012) (commenting that removal of landfill could increase the property value).

Though this court, in contrast to *Fruehauf*, was able to determine a specific value for the transferred property, it will address the City's good faith since GGI argued that the City foreclosed in bad faith. GGI's allegation that the City interfered with a possible sale to Chinese investors was not supported by any evidence: Mr. Rock could not remember the investors' names, did not produce any contract, and his allegation that the City told the investors it could sell the property to them cheaper than GGI, even if true, seems valid since Mr. Rock wanted $100,000 on top of

---

determining the true value of particular properties or the ratio of assessment to true value of a particular property."); *Willingboro Twp in Burlington County v. Burlington County Bd of Taxation*, 62 N.J. 203 (1973) ("The state equalization function of the county boards does not in any way affect individual tax assessments against property owners.").

[16] GGI complained that the land extraction method produces less accurate results "due to its reliance on discretionary determinations," and that Mr. Bainbridge wrongly included in his appraisal two sales from New Jersey's "nonusable" category, an estate sale and a sale through the bankruptcy court. *See* Doc. No. 47, p. 14; N.J.A.C. 18:12-1.1(a)(10), (31). However, all appraisals require discretionary decisions of an appraiser. As for "non-usables," Mr. Bainbridge explained that those sales are only non-usable by taxpayers appealing their assessment, while appraisers can use them, adjusting for the particular situation they were sold under. T2, pp. 131-33. In addition, Mr. Bainbridge only used those sales as a benchmark to corroborate his overall estimate of value. T2, p. 136.

Moreover, "non-usable" sales falling in certain categories, including the two Mr. Bainbridge's properties fell into, "may be used if after full investigation it clearly appears that the transaction was a sale between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell, with all conditions requisite to a fair sale with the buyer and seller acting knowledgeably and for their own self-interests, and that the transaction meets all other requisites of a usable sale." N.J.A.C. 18:12-1.1(b).

[17] Mr. Bainbridge testified that he did not estimate a value as of December 31, 2015 "because I couldn't inspect it going backwards." T2, p. 76. But he could have attempted a retrospective appraisal. *See The Appraisal of Real Estate*, p. 52 (Appraisal Institute, 14th ed. 2013) (stating that the valuation date of an appraisal can be a current, retrospective or prospective date); *In re Curtis Papers, Inc.*, 2008 WL 2777277, at *2 (considering a retrospective appraisal because the relevant valuation dates were from October 1, 2001 to October 1, 2005).

whatever the delinquent taxes had accrued to, while the City would only sell for the amount of the taxes. Moreover, the investors allegedly purchased property in North Jersey instead, suggesting that their interest was low to begin with.

The court already debunked GGI's argument about the City's refusal to let CDL pay the taxes over time. Notably, the City had filed its tax foreclosure complaint six months prior to CDL's request. GGI produced no evidence that the City's request that it end certain leases on the property was inappropriate. The City proceeded in good faith by allowing GGI to appeal its assessment in 2012 without first bringing the taxes current, something it did not have to do, *see* N.J.S.A. § 54:3-27, and for not commencing foreclosure until more than five years after the 2009 default, despite the property not earning any income, and GGI not paying any more taxes or (in 2015, at least) insuring the property. Despite the court's reproach in its previous opinion, GGI did not cite to any duty of the City to cooperate with its sale effort. Thus, the court finds that the City acted in good faith.

Nevertheless, the court holds that $530,000 is not reasonably equivalent value to $429,767. The court previously stated that in determining "rough" equivalence, other courts' decisions in the tax foreclosure context are of little help, as these cases had widely divergent figures to compare, and that the Supreme Court in *BFP* rejected the "70 percent rule" created by *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (1980). *BFP*, 511 U.S. at 540. This court agrees with *In re Fitzgerald*, 237 B.R. 252, 267 n. 22 (Bankr. D. Conn. 1999), finding the dollar amount of difference more important than any percentage guideline. As the City received $100,233 more than its debt through this transfer, not an insignificant amount considering the $372,537 in claims it could be applied to pay, GGI did not receive reasonably equivalent value in exchange for the transfer.

The court further finds that GGI was insolvent or became insolvent at the time of the transfer. It agrees with the City that some of GGI's scheduled debts look suspicious as possibly belonging to insiders that may have made capital contributions rather than loans. But suspicion is not proof, and the City did not present any evidence of the beneficiaries of the two-member family trusts, or the NARO or RONA trusts, to rebut GGI's assertion of insolvency. Moreover, GGI's schedules reflect that at the time of the transfer, its debts were greater than all of its property. Again, the City did not present any evidence to rebut this. Finally, if not already insolvent, certainly the transfer of arguably its only asset left GGI insolvent. *See* 11 U.S.C. § 101(32).

Thus, the transfer was constructively fraudulent as there has been a transfer to the City of an interest of GGI in property within 2 years before the date of the filing of the petition, which GGI did not receive reasonably equivalent value, and at the time of the transfer, GGI was or became insolvent. Accordingly, the transfer can be avoided pursuant to Section 548 of the Bankruptcy Code.

## Count Two - Section 547

As the court has determined that the transfer of the property to the City is void under section 548, it need not make a determination under section 547.

## Count Three – Section 550(a)

In its Complaint, GGI sought restoration of the property to it as an asset of its bankruptcy estate. But in its opposition to summary judgment, it stated that it is also amenable to recovering the value of the property as of the December 31, 2015 transfer.

While the fraudulent transfer laws are intended to protect the debtor's creditors, *EBC I v. America Online, Inc. (In re EBC I, Inc.)*, 382 Fed. Appx. 135, 137 (3d Cir. 2010); *In re R.M.L., Inc.*, 92 F.3d at 150, section 550(a) instead speaks in terms of "benefit to the estate." *In re New Life Adult Med. Day Care Ctr., Inc.*, 11-43510 (NLW), 2014 WL 6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014); *TWA v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 972 (Bankr. D. Del. 1994). If there is no reorganized entity or creditors to receive post-confirmation payment, there may be no benefit to the estate, just benefit to the owners of the debtor. *In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL 6851258, at *6. *See TWA*, 163 B.R. at 972 ("the Code clearly contemplates the use of avoidance action recoveries in the operation of the business in a manner which only indirectly benefits creditors.").

It is within a court's discretion to determine whether the court should order payment of the value of the property or the property itself. *In re Berley Associates, Ltd.*, 492 B.R. 433, 442 (Bankr. D.N.J. 2013). Some courts believe that section 550(a) gives a preference to the return of property unless it would be inequitable to do so. *Id.* (citing *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan. 1991)). "This approach finds some support in the language of § 550(a) and the history behind it. Section 60(b) of the Bankruptcy Act allowed the recovery of value only when the property had been converted. While this limitation is gone, § 550(a) lists first the recovery of property and then permits the recovery of value only upon the order of the court." *Id.* at 442-43. "Other courts have simply read § 550(a) as placing in the court's discretion the choice between return of the property and an award of its value." *Id.* at 443.

> Factors considered by courts in making this discretionary decision of whether to order recovery of the property or its value include whether the property is recoverable, whether the property has diminished in value by virtue of depreciation or conversion, whether there is conflicting evidence as to the value of the property and whether the value of the property is readily determinable and a monetary award would result in a savings to the estate.

*Collier on Bankruptcy*, ¶ 550.02[3] (Matthew Bender 2017) (footnote omitted).

Though the court finds that the property's improvements continue to decline in value, in light of the disparity between the parties' positions regarding the property's value, it finds that the most equitable remedy is to return the property to GGI and to allow GGI to address the City's prepetition claim through its plan of reorganization.[18] If GGI proves the court wrong as to value (i.e. that it is worth $600,000 or more), then that higher value will also inure to the benefit of the City by paying its administrative expense claim consisting of its postpetition taxes.[19] This remedy

---

[18] The City retains any and all of its rights and remedies with regard to its postpetition tax claims.

[19] The court declines to entertain GGI's request that it determine its postpetition tax liability, as improperly first raised in a post-trial brief. The court also notes that GGI is time-barred from determining the assessments—or offsets, *see In re Custom Distribution Servs. Inc.*, 224 F.3d 235, 245 (3d Cir. 2000)—as of October 1, 2016 or October 1, 2017, as those had to be challenged as of April 1 of 2017 and 2018, respectively. *See* N.J.S.A. 54:3-21. Contrary to GGI's assertion, section 108 does not toll those deadlines. *See In re Read*, 692 F.3d 1185, 1191 (11th Cir. 2012) (stating that

also avoids the municipality having to come up with cash, which could adversely impact its budget and operations. In addition, GGI argues the cash settlement as an alternative justified by the City's bad faith—a conclusion the court does not agree with.

## V.    CONCLUSION

Based on the foregoing, judgment is granted in favor of GGI as to Counts One and Three of the Complaint. As a result, a determination as to Count Two is unnecessary. The City shall transfer the property back to GGI within sixty (60) days of this Memorandum Decision.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: June 6, 2018

---

because Congress intended in enacting 505(a)(2)(C), allowing redetermination of taxes only within the period for contesting the amount under applicable nonbankruptcy law, to prevent bankruptcy abuse by debtors and ensure that debtors pay the amount they owe as soon as possible, the specific provisions of section 505 must prevail over the more general provisions of § 108(a)); *In re CM Reed Almeda 1-3062, LLC*, 13-19117-GS, 2016 WL 3563148, at *8 (Bankr. D. Nev. May 31, 2016) ("The deadline for the debtor to seek relief as to such taxes is determined by state law, and is not extended by § 108."), *aff'd*, 2:13-BK-19117, 2017 WL 1505215 (B.A.P. 9th Cir. Apr. 26, 2017); *In re Airport Office Complex, Inc.*, 5-08-BK-50874-JJT, 2012 WL 5955009, at *2 (Bankr. M.D. Pa. Nov. 28, 2012) (stating that the majority of bankruptcy decisions have concluded that section 108(a) provides no relief to the section 505(a)(2)(C) time limit).